**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| MARCELINO ALBUERNE & RUBY JENKINS,<br><br>Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., et al.,<br><br>Defendants. | ) | Case No. 5:24-cv-04043 |

**MEMORANDUM IN SUPPORT OF DEFENDANT RENT RECOVERY SOLUTIONS, LLC'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR REMITTITUR, AND MOTION TO ALTER OR AMEND JUDGMENT**

Defendant Rent Recovery Solutions, LLC submits this Memorandum in support of its Renewed Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial or Remittitur, and Motion to Alter or Amend Judgment, as follows:

## INTRODUCTION

## I. STATEMENT OF THE SPECIFIC RELIEF BEING REQUESTED

Defendant Rent Recovery Solutions, LLC ("RRS") renews its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and moves alternatively for a new trial or remittitur under Rule 59(a) and to alter or amend the judgment under Rule 59(e). The Judgment entered on August 14, 2026, awards each Plaintiff $150,000 in actual damages and $500,000 in punitive damages. Doc. 171. RRS requests judgment as a matter of law on willfulness and vacatur of the $1 million punitive damages award; judgment on Plaintiffs' causation and credit-denial and emotional distress theories; and, alternatively, a new trial or remittitur. RRS also asks the Court to vacate the antecedent liability ruling considering the intervening Tenth Circuit law and the disputed inferences in the summary-judgment record.

RRS preserved the Rule 50 issues. At the close of Plaintiffs' evidence, RRS moved orally because Plaintiffs had not made a submissible case "as to causation and as to damages that arose from the specific alleged violations of the FCRA" or "as to willfulness" and asked for judgment as a matter of law. Trial Tr. Vol. 3 at 589:1-10. The Court reserved. Id. at 589:11-12. At the close of all evidence, the Court asked, "You renew your motions?" RRS answered, "We renew our motion, judge," and the Court again reserved. *Id*. at 628:1-4.

## II. STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT

The sole remaining trial claim arose under 15 U.S.C. § 1681s-2(b). The Court granted Plaintiffs' partial summary judgment finding RRS's three ACDV investigations to be unreasonable, leaving actual damages and willfulness for trial. Doc. 103 at 1, 10-17. The Court expressly recognized that § 1681s-2(a)'s general accuracy duty has no private right of action. *Id*. at 10. The jury, nevertheless, received an instruction reciting that duty, found willfulness as to each Plaintiff, and returned identical awards. Docs. 169 at 6; 170; 171.

The investigation evidence was substantially undisputed. Plaintiffs supplied ACDVs with a September 2022 email from Montane employee Ruth White confirming receipt of a $927.10 cashier's check and a screenshot reflecting a same-day bank withdrawal. Doc. 103 at 4-8. But Rent Recovery's notes showed that Montane searched the physical checks it received in September and October 2022 and Montane also reviewed its electronic system for that same period and could not find the payment. Doc. 103 at 4-8. Montane again searched in July 2023 and reported that it did not see the payment. *Id*. at 4-8. Compliance auditor Yasmin Appawu reviewed each ACDV, the attached documents, and the notes; recognized the conflict; and credited the two later client confirmations. *Id.;* Trial Tr. Vol. 3 at 591–603. She followed the procedures in which she had been trained, believed those procedures complied with the FCRA, and testified that the deadline-based

incentive did not depend on whether an account was verified, but whether the deadline lapsed. Trial Tr. Vol. 3, 619:3-18.

Plaintiffs' actual-damages proof improperly combined post-ACDV distress with events and conditions that predated any § 1681s-2(b) duty. Albuerne described serious distress, but acknowledged marital trouble beginning in 2022, depression and drinking by August 2023, bipolar disorder, a prior suicide attempt, and no medical treatment tied to the actionable period. Trial Tr. Vol. 2 at 371, 382–405, 430–35. His Navy Federal letter was admitted only for its effect on him, not to prove why the lender acted; it identified other possible reasons, and no Navy Federal witness testified. *Id*. at 385–95, 455–57; Trial Tr. Vol. 3 at 493–95. Jenkins did not know Capital One's criteria, had not read an adverse-action letter, did not know why she was denied, and had other derogatory accounts. Trial Tr. Vol. 3 at 553–65, 580–82. Yet each received the same $150,000.

For the reasons stated below, this evidence was insufficient to support a punitive damage award and RRS's motion must be granted.

## III. ARGUMENT AND CITATION OF AUTHORITY

### A. Rule 50: Renewed Motion for Judgment as a Matter of Law.

After a party has presented their case, the court may grant a motion for judgment as a matter of law if it finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party…" Fed. R. Civ. P. 50(a). A party may renew its motion after trial. Fed. R. Civ. P. 50(b). The Court views the evidence favorably to the verdict without weighing credibility but must enter judgment when the only reasonable conclusion favors the movant. *Bond v. Sheriff of Ottawa Cnty*, 173 F 4th 1265, 1290 (10th Cir. Apr. 21, 2026)); *Elm Ridge Exploration Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013).

### 1. No Legally Sufficient Evidence Supports the Jury's Finding of Willfulness.

A negligent FCRA violation is not necessarily willful. Willfulness requires that the defendant either knowingly violated the FCRA or acted in reckless disregard of its requirements. *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 57 (2007). Reckless is an objective standard requiring conduct that creates "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.*, at 68-69. The risk must be "substantially greater than the risk associated with a reading that was merely careless." *Id.*, at 69. Thus, even an unreasonable investigation does not, without more, establish willfulness.

The Tenth Circuit Court of Appeals has enforced this distinction in the FCRA context. In *Birmingham v. Experian Info. Solutions, Inc.*, the court affirmed judgment against willfulness because the plaintiff identified neither objectively unreasonable company procedures nor evidence that the defendant's handling of the particular dispute was reckless. *Birmingham v. Experian Info. Solutions, Inc.*, 633 F. 3d 1006, 1010–12 (10th Cir. 2011). It was not enough to show that the defendant might have mishandled the dispute or failed to correct the information as the plaintiff believed it should have.

Similarly, in *Llewellyn v. Allstate Home Loans, Inc.*, the evidence indicated that the furnisher failed to consider pertinent information and delayed correcting its reporting after receiving information suggesting the account should have been reported differently. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1184–85 (10th Cir. 2013). The Tenth Circuit nevertheless held that the evidence showed, at most, negligence. *Id.*, at 1185. The record did not demonstrate an intent to thwart the consumer's FCRA rights, an objectively reckless company procedure, or conduct presenting the unjustifiably high statutory risk required by *Safeco*. *Id.* at 1185.

Accordingly, Plaintiffs could not establish willfulness merely by proving that RRS received their disputes, possessed information relevant to those disputes, and should have taken an additional investigative step. They had to present evidence from which a reasonable jury could find that RRS knowingly violated the FCRA or employed a procedure or interpretation creating an obvious and unjustifiably high risk of violating it. See *Safeco,* 551 U.S. at 68–70; *Birmingham*, 633 F.3d at 1010–12. That evidence was not presented at trial.

**a. The Evidence Showed an Investigation—Not Conscious or Objectively Reckless Disregard.**

Even when viewed in Plaintiffs' favor, the evidence may support the Court's negligence finding, but it does not support a finding of willfulness. RRS did not ignore the ACDVs or refuse to investigate. Ms. Yasmin Appawu, the employee responsible for the three investigations, testified that she reviewed the ACDVs, the supporting images, and RRS's account history. Trial Tr. Vol. 3 at 591:1–603:25. She also considered the White email concerning the purported payment and compared it with information reflecting that Montane had conducted two subsequent searches but remained unable to locate the payment. *Id*.

Thus, this was not a case in which the furnisher fabricated information, automatically rejected a dispute without review, or possessed undisputed proof that its reporting was false. RRS's file contained conflicting information. The White email suggested that a payment had been made, while Montane's two later searches indicated that the payment could not be found. RRS relied on the more recent information from the creditor. See Doc. 103 at 4-8.

Plaintiffs' theory was that RRS should have taken an additional step to reconcile those conflicting records before verifying the accounts. Even accepting that theory and the Court's negligence finding, the failure to take one more investigative step does not demonstrate that RRS knowingly violated the FCRA or consciously accepted an obvious statutory risk substantially

greater than carelessness. It shows, at most, an inadequate investigation—the precise distinction recognized in *Llewellyn*.

The District of Colorado reached the same conclusion on materially similar allegations in *Ward v. Trans Union, LLC*, No. 21-cv-02597-LTB-SKC, 2023 U.S. Dist. LEXIS 115723, at *19-28 (D. Colo. May 12, 2023). There, the plaintiff contended that the furnisher should have reviewed documents in its possession sooner, should have sought additional documents from the creditor, and should have contacted or investigated additional sources. *Id*., at * 21-26. The court concluded that those matters could bear on the reasonableness of the investigation but did not establish the elevated mental state required for willfulness. *Id*., at * 27. The Tenth Circuit's subsequent decision in that litigation reversed on the separate ground that the plaintiff had failed to establish actionable inaccuracy; it did not reject the district court's distinction between an arguably incomplete investigation and willful noncompliance. See *Ward v. National Credit Systems, Inc*., 182 F. 4th 918 (10th Cir. July 20, 2026).

#### b. RRS's Procedures And Appawu's Conduct Do Not Satisfy ***Safeco***'s Demanding Standard.

Appawu testified that she followed the training and procedures RRS had used during her approximately seven years of performing dispute investigations and that she believed those procedures were reasonable. Trial Tr. Vol 3, 605:12-16, 621:2–624:15. Plaintiffs presented no evidence that RRS trained its investigators to disregard material submitted with an ACDV, to verify information known to be false, or to avoid correcting information shown to be inaccurate. Nor did Plaintiffs identify an authoritative judicial or regulatory interpretation that made RRS's chosen investigative procedure objectively unreasonable under the circumstances presented here.

That evidentiary omission matters. In *Birmingham*, the Tenth Circuit found no willfulness where the plaintiff failed to identify either a company procedure that recklessly violated the FCRA

or specific conduct toward the consumer that met the recklessness standard. *Birmingham*, 633 F.3d at 1012. The same is true here. Plaintiffs criticized the adequacy of the steps Appawu took, but they did not show that RRS's procedures created an obvious and unjustifiably high risk of violating § 1681s-2(b).

The evidence concerning Appawu's productivity compensation does not alter the analysis. The incentive concerned timely completion of ACDVs. Trial Tr. 604:1–622:25. No evidence showed that Appawu's compensation depended on verifying a debt, rejecting a consumer's position, minimizing corrections, or reaching any particular investigative outcome. An incentive to complete investigations promptly—an objective consistent with the FCRA's statutory deadlines—does not permit a reasonable inference that RRS encouraged inaccurate verifications or consciously disregarded consumers' rights.

**c. *McGhee* Neither Established Willfulness Nor Placed RRS on Notice That the Procedures It Currently Uses Was Unlawful.**

Plaintiffs also could not establish willfulness through *McGhee v. Rent Recovery Solutions, LLC*. The Court ruled that the McGhee opinion itself was inadmissible and permitted limited questioning only concerning notice and subsequent policy changes. Trial Tr. 264:16–267:25. *McGhee* did not find that RRS willfully violated the FCRA. It was a report and recommendation denying summary judgment because a jury could potentially find recklessness under the record presented there. *McGhee v. Rent Recovery Solutions, LLC*, No. 1:17-cv-0072-CC-JKL, 2018 U.S. Dist. LEXIS 220732, at *42–43 (N.D. Ga. July 6, 2018), report and recommendation adopted, *McGhee v. Rent Recovery Solutions, LLC,* 1:17-cv-0072-CC-JKL, 2018 U.S. Dist. LEXIS 237002 (N.D. Ga. Sept. 21, 2018). A determination that evidence creates a factual dispute at summary judgment is not an adjudication that the conduct was willful, much less a ruling that RRS's procedures in every subsequent case violate the FCRA.

The factual and procedural differences are dispositive. *McGhee* involved a reported collection balance that materially exceeded the amount of a court judgment. The plaintiff argued that an authoritative judgment conclusively established the correct amount, while RRS's then-existing policy appeared to prevent investigators from contacting an outside source to obtain missing documentation. The magistrate judge reasoned:

> Rent Recovery adopted a reinvestigation policy that does not appear to provide employees with the flexibility to contact anyone to obtain such documentation when it is missing. A jury could find this policy, in practice disallows a meaningful investigation into a consumer's dispute…I am persuaded that a reasonable jury could conclude that Rent Recovery acted recklessly…

*Id*. at *42–43.

The evidence here concerned a different policy and a different factual problem. RRS's trial evidence established that its current procedures permit investigators to contact the creditor via email or other sources when additional information is needed and to contact some creditors, like Montane, by email through Payready. Trial Tr. Vol. 3, 612:10, 611:14–612:24. The record also showed that RRS had information from Montane reflecting two searches conducted after the White email. RRS therefore was not operating under the inflexible policy criticized in *McGhee*, nor was it disregarding an authoritative judgment that conclusively established the reported information was false. It evaluated conflicting records and relied on the creditor's more recent inability to locate the payment.

Evidence that RRS changed its procedures after *McGhee* undermines Plaintiffs' notice theory. It shows that RRS responded to the concern identified there by allowing additional contacts and information gathering. Trial Tr. Vol. 2, 304:8-24, 318:13–319:12. *McGhee* did not notify RRS that reliance on a creditor's two subsequent searches, when weighed against an earlier email, constituted a knowing or objectively reckless FCRA violation.

Plaintiffs' theory improperly collapses negligence into willfulness: because RRS should have investigated further, it must have acted recklessly. *Safeco*, *Birmingham*, and *Llewellyn* foreclose that reasoning. The evidence must establish not merely that RRS selected an inadequate investigative step, but that its conduct created an obvious and unjustifiably high risk of violating the FCRA that was substantially greater than ordinary carelessness. No trial evidence supports that finding.

Even drawing every reasonable inference in Plaintiffs' favor, the evidence showed that RRS reviewed the disputes, considered conflicting information, followed an established procedure that permitted additional inquiry, and made an allegedly erroneous judgment about which information to credit. That may support negligence; it cannot, as a matter of law, satisfy § 1681n's substantially more demanding willfulness standard. The Court should enter judgment as a matter of law for RRS on willfulness and vacate both $500,000 punitive damages awards.[1]

**2. No Legally Sufficient Evidence Supports the Jury's Finding of Actual Damages.**

The record lacks sufficient evidentiary support for actual damages based on the but-for causation standard. A FCRA plaintiff must prove actual but-for causation: the claimed harm would not have occurred absent the statutory violation. *Ward*, 182 F. 4th at 929. Meaning the Plaintiffs must prove but-for causation regarding the inadequate investigation, not inaccurate credit reporting. Section 1681s-2(b) duties arise only when a CRA notifies the furnisher. *Maiteki v. Marten Transportation Ltd*., 828 F.3d 1272, 1274-75 (10th Cir. 2016). Thus, the actionable periods began, at the earliest, with RRS's receipt of Albuerne's October 27, 2023 ACDV and Jenkins's

[1] This argument also applies to a motion for a new trial under Fed. R. Civ. P. 59. The finding of willfulness is not supported by the evidence. See, *Bond v. Sherriff of Ottawa Cnty.*, 173 F.4th 1265, 1295, fn. 21 (10th Cir. April 21, 2026) ("'When a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence.'"). The finding of willfulness is clearly, decidedly and overwhelmingly against the weight of the evidence.

December 29, 2023 ACDV—not the March or April 2023 dates emphasized at trial. Doc. 103 at 6-9.

RRS need not establish that some other fact was the sole cause of Plaintiffs' injuries. Plaintiffs bore the affirmative burden of proving that, absent RRS's allegedly deficient response to a CRA dispute, the identified injury probably would not have occurred. That proof cannot rest on speculation about what an absent lender might have decided.

The distinction is decisive here. Both Plaintiffs repeatedly described RRS as an "impact," "factor" or "huge factor." Trial Tr. Vol. 2, 397:20–398:9; Vol. 3, 564:16-25. But none presented evidence answering the controlling counterfactual question: would the credit denial or emotional harm have occurred anyway if RRS had responded differently to the CRA? For that reason, this Moton must be granted.

**a. No Reasonable Jury Could Find That RRS's Investigation Caused Either Plaintiff Any Credit Damage.**

No competent evidence connected RRS to either Plaintiff's credit damage. There is no evidence showing RRS caused Albuerne's Navy Federal decision. No Navy Federal underwriter, loan officer, records custodian, or other decision maker testified. Plaintiffs produced no underwriting file, scoring model, underwriting guideline, or testimony identifying which consideration was necessary for Navy Federal's decision.

Plaintiffs cannot point to the Navy Federal letter as such evidence. The adverse-action letter was admitted only to show its effect on Albuerne, not to prove the reasons for the denial. Trial Tr. Vol. 2 at 385–89. It therefore could not prove the lender's reasons. Albuerne attempted to fill that with his own opinion that the collection account was the first or most important reasons. Trial Tr. Vol. 2, 391:3–392:6. But he admitted that he had been a mortgage-loan originator, not an underwriter, had never made the underwriting decision on mortgage application, had no

underwriting training, that he had left Navy Federal in 2022, and did not know whether Navy Federal's criteria had changed by December 2023. Trial. Tr. Vol. 2, at 412:12–415:6. His conjecture about another person's underwriting decision was neither personal knowledge testimony under Fed. R. Evid. 602 nor admissible lay opinion under Fed. R. Evid. 701. To the extent his testimony depended on specialized underwriting knowledge, it was expert testimony that Albuerne was not qualified or disclosed to give.

Even if the denial letter were considered substantively, it would not establish but-for causation. The letter identified other adverse conditions, including excessive obligations relative to income, high ratio or revolving balances to available limit, and an incomplete application. Trial. Tr. Vol. 2, 393:8-23, 456:1-21, Vol. 3, 489:3–491:22, 493:1–494:19. The undisputed financial evidence reinforced those independent concerns. Albuerne's Navy Federal Visa had an approximately $19,400 limit and remained at or above that limit during much of the relevant period. Trial. Tr. Vol. 2, 449:1–455:19. He was also relatively new to his job and earned approximately $44,800 in 2023. Trial Tr. Vol. 2, 456:23–457:21. Income: Trial Tr. Vol. 3, 471:7-15. Without testimony from Navy Federal, the jury could not determine whether Navy Federal would have approved the loan despite those conditions if the RRS tradeline had been changed.

Nor did Albuerne's later mortgage approval establish the necessary counterfactual. By the later application, he had remained in his job for more than two years, earned more income, was no longer married, completed a different application, and applied to a different lender. Tr. Vol. 3, 466:14–468:24. Too many material underwriting variables changed to permit a non-speculative inference that removal of RRS's reporting caused the different result.

The proof concerning Jenkins's Capital One application was even more deficient. Jenkins testified that she applied for a credit card and saw a screen stating that she was not approved. Trial

Tr. Vol. 3, 552:1–555:24. The screen did not state why she was denied. Plaintiffs' Exhibit 33 at 1; Trial Tr. Vol. 3, 555:17-24, 581:3-6. Capital One apparently sent or intended to send an adverse-action letter, but Jenkins did not read or retain it. She expressly admitted that she did not know the Capital One income requirement and that she did not read the Capital One denial letter because she didn't feel the need to go through her junk mail. Trial Tr. Vol. 3, 580:17–581:16. No Capital One representative testified. No underwriting criteria, scoring information, application file, adverse-action letter, or other decision-making evidence was admitted. Jenkins's belief that she had "decent approval odds" through Credit Karma did not establish how Capital One evaluated her application. Trial Tr. Vol. 3, 556:4-18. The evidence also established several alternative adverse accounts, including medical collections, two Chase defaults, and another rental-related collection. Trial Tr. Vol. 3, 561:1–564:25, 581:17–582:20. Jenkins acknowledged that RRS did not cause all of her credit problems; she characterized RRS as "not helpful" and "a huge factor." Trial Tr. Vol. 3, 564:16-25. That testimony does not establish that Capital One would have approved her application but for RRS's alleged violation.

At most, the evidence allowed a jury to speculate that the trade line may have influenced Navy Federal or Capital One. *Ward* requires proof that the denial would not have occurred without the alleged statutory violation. Plaintiffs did not supply that proof. RRS therefore is entitled to judgment on the claimed credit-opportunity injuries. Because the verdict did not separate those injuries from emotional distress, the Court cannot know what portion of either $150,000 award rests on an unsupported theory. Doc. 170 at 1-2; Doc. 169 at 12. At minimum, that uncertainty requires a new damages trial or remittitur. See *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1298-99 (10th Cir. 2001)( supporting a new trial when an erroneous instruction presents an improper theory and the court cannot determine whether the general verdict rested on it.) Plaintiffs' extensive

preexisting conditions and the awards' identical amount make a new trial necessary even if some distress evidence survives Rule 50.

**b. Plaintiffs Did Not Connect Their Emotional Distress to the Violation.**

Plaintiffs likewise failed to distinguish emotional distress caused by an actionable § 1681s-2(b) violation from distress caused by the underlying debt, ordinary credit problems, the original reporting, marital separation, financial hardship, employment demands, or other life circumstances. That distinction matters because RRS's private-action duties arose only after it received notice of a dispute from a CRA. Plaintiffs could recover only for distress that would not have occurred absent RRS's deficient post-notice investigation—not for every emotional consequence associated with the debt or the parties' deteriorating finances and marriage.

Throughout trial, Plaintiffs testified at length about what happened prior to the violation.

Albuerne testified that his financial hardship, drinking, depression, isolation, and marital problems began during or shortly after the move to Kansas, well before the allegedly unlawful November 20, 2023 ACDV response. Trial Tr. Vol. 2, 367:1–372:25, 450:1-19, Trial. Tr. Vol. 3, 466:14-24. He described being separated from his wife, paying expenses in two states, living in an unsuitable cabin, lacking transportation, working in a stressful correctional environment, drinking heavily, and experiencing longstanding depression or bipolar symptoms. Trial Tr. Vol 2, 371:4–372:25, 395:1–403:25, 421:1–434:25; Vol. 2, 430:8-21, 432:1-23, 383:5-14, 396:14-25, 404:17-23.

Jenkins similarly described extensive independent pressures: travel between states, extremely long workdays, financial strain, inadequate housing, drinking, physical separation, and a marriage already deteriorating by the time of the Capital One denial. Trial Tr. Vol. 3, 516:1–522:25, 529:1-25, 552:1-19, 554:5–555:24, 558:1–560:25. She described RRS as "not helpful"

and "a huge factor," while conceding that RRS did not cause all of the couple's credit problems. Trial Tr. Vol. 3, 564:1-25. Again, that testimony never answered whether the identified emotional distress would have occurred without RRS's insufficient investigation.

*Llewellyn* does not save this proof. The plaintiff there described previously controlled conditions, identified discovery of the negative reporting as the event precipitating a marked deterioration, and gave detailed testimony about new or aggravated symptoms arising at that time. 711 F.3d at 1182–83. Here, the transcript establishes that the principal symptoms and stressors were already present, had multiple acknowledged causes, and were not segregated by date or by statutory violation. Detailed testimony that distress existed is not the same as proof that an FCRA investigation failure was its but-for cause.

Because Plaintiffs failed to produce legally sufficient evidence that any claimed credit or emotional injury would not have occurred absent RRS's alleged § 1681s-2(b) failures, RRS is entitled to judgment as a matter of law on Plaintiffs' negligent FCRA claims and on their claims for actual damages. The Court should vacate the $150,000 actual-damages award to each Plaintiff. At a minimum, the absence of competent causation evidence requires a new trial or remittitur as to actual damages. See, *Bond*, 173 F.4th at 1295, fn. 21.

**B. Rule 59: New Trial or Amend Judgment**

Alternatively, the Court should grant a new trial or amend the judgment under Rule 59. That rule authorizes a court, following trial, to "grant a new trial on all or some of the issues…for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In considering jury instructions, the "inquiry is not whether the instructions 'are flawless, but whether the jury was misled in any way and whether it had a[n] understanding of the issues and its duty to decide those issues.'" *Bond*, 173 F.4th at 1295 (quoting

*Brodie v. Gen. Chem. Corp*., 112 F.3d 440, 442 (10th Cir. 1997). On a claim of wrongfully admitted evidence, the movant must establish prejudice. *Id*., at 1299.

### 1. Instruction No. 5 Impermissibly Permitted The Jury To Impose Damages and Punitive Liability Under a Statutory Duty for Which Congress Provided No Private Right of Action.

The Court previously held that 15 U.S.C. § 1681s-2(a) does not create a private right of action and that Plaintiffs could proceed only under the post-notice duties imposed by § 1681s-2(b). Doc. 103 at 10. But Instruction 5 nevertheless told the jury that a furnisher has a duty to provide accurate information before describing the post-CRA-notice duties. Doc. 169 at 6. That language comes from §1681-2(a), not the privately enforceable duties under § 1681s-2(b). RRS specifically objected that the first bullet quoted subsection (a), that subsection (a) was not actionable or at issue, and that including it would prejudice RRS. Trial Tr. Vol. 3 at 661:15–662:3. The Court declined to remove it because the instruction was "reading the statute." *Id.* at 662:4-12.

This instruction mislead the jury and its understanding of the issues and duties it as to decide. Plaintiffs repeatedly relied on precisely the theory presented by the erroneous instruction. They told the jury that RRS violated the law for "1,230 days," beginning when the account was first reported in April 2023 and continuing through trial. Trial Tr. Vol. 4 at 696:7–697:8. Counsel repeated that RRS's reckless conduct continued for 1,230 days and asked the jury to punish RRS for that entire period. *Id.* at 726:4-729:4. That argument extended the alleged violation well before the consumer reporting agencies transmitted the disputes that triggered any duties under §1681s-2(b).

RRS asked the Court to identify the date on which an actionable violation could have begun because Plaintiffs had introduced substantial evidence of distress arising before any violation occurred. Trial Tr. Vol. 3 at 670:2–671:20. The Court declined. *Id*. 671:18-20. Instruction No. 11 stated generally that Plaintiffs could not recover for harm preceding "the violation," but it neither

identified the operative violation nor supplied its earliest possible date. Doc. 169 at 12. Instruction No. 5 instead identified the initial reporting of allegedly inaccurate information as an affirmative statutory duty. Reading the instructions together thus did not cure the problem; it reinforced Plaintiffs' assertion that the compensable violation began in April 2023. This is error.

The general caution not to award pre-violation harm did not cure the problem. Instruction 11 referred simply to harm before "the violation" without identifying the violation or date, while Instruction 5 had just supplied the nonactionable accuracy duty. Doc. 169 at 6, 12. Plaintiffs then told jurors the violation began with reporting in April 2023. Trial Tr. Vol. 4, 696:7-24, 727:4-13. If a court erroneously instructed the jury on an improper legal theory, and the court is unable to determine with "absolute certainty" whether the jury relied on the erroneous instruction, the general verdict must be reversed. *Allen*, 241 F.3d at 1298–99. The verdict form does not reveal which duty the jury applied nor what portion of its awards compensated for any pre-notice harm. It asked for aggregate actual damages and a yes-or-no willfulness finding. Doc. 170 at 1-2. A new trial is required on actual damages, willfulness, and punitive damages.

### 2. The Cumulative Effect of the *McGhee* Evidence and Plaintiffs' Improper Closing Argument Is Grounds For a New Trial.

A new trial also is warranted because Plaintiffs used the limited admission of the *McGhee* evidence as a vehicle to invite propensity reasoning and punishment for conduct beyond this case. In evaluating prejudice from attorney misconduct, the Tenth Circuit considers the pervasiveness of the misconduct, the adequacy of any curative measures, the size of the verdict, and the strength of the evidence supporting it. *Osterhout v. Board of County Commissioners*, 10 F.4th 978, 991-992 (10th Cir. 2021). Each consideration favors a new trial.

First, the challenged use of *McGhee* was neither isolated nor confined to legitimate notice evidence. The Court excluded the *McGhee* opinion and permitted questioning only as to notice

and any resulting policy changes. Trial Tr. Vol. 2 at 262–68. Plaintiffs nevertheless argued that another court previously had characterized RRS's practices as potentially reckless. *Id.* at 318–23; Trial Tr. Vol. 4 at 697:2-8. In closing, Plaintiffs equated that earlier dispute with this case and argued, in substance, that RRS had continued conduct already identified as reckless. Trial Tr. Vol 4, 697:2-8.

That argument obscured critical differences. *McGhee* involved a collection balance that materially exceeded a court judgment and an asserted policy that appeared to prevent employees from obtaining missing documentation. *McGhee,* 2018 U.S. Dist. LEXIS at *42–43. The cited decision did not adjudicate RRS willfulness; it denied summary judgment because a jury could draw a particular inference from the policy and facts then presented. Here, the evidence showed that RRS's policy permitted investigators to contact third parties and that Appawu considered the dispute materials, account history, White email, and Montane's two subsequent unsuccessful searches for the payment. Treating *McGhee* as a prior finding of recklessness invited the jury to decide this case based on supposed corporate character, rather than the conduct and mental state proved here.

Second, the improper argument extended well beyond *McGhee*. Plaintiffs characterized RRS's defense as frivolous, urged punishment on behalf of consumers throughout the country, asserted without supporting financial evidence that violating the FCRA was more profitable than complying, and suggested that RRS could readily pay a large award. Trial Tr. Vol. 4 at 697:2-20, 772:11–773:2. Counsel also described an unrelated case in which another company allegedly faced an approximately $100 million punitive verdict and that his "friend's" company then held a meeting with its chief executive officer. *Id.* at 771:24–772:10. Counsel used that outside-the-record story to ask what would have to happen in RRS's conference rooms before its behavior would

change. Id. at 772:11-23. Closing argument must remain confined to the evidence and reasonable inferences from that evidence. *Whittenburg v. Werner Enterprises Inc.*, 561 F.3d 1122, 1128–29 (10th Cir. 2009). The unrelated punitive award, corporate meeting, nationwide effects, profitability assertion, and suggested financial capacity were not evidence in this case. They supplied the jury with an extra record punitive benchmark and encouraged an award based on wealth, deterrence of other companies, and injuries to nonparties.

Third, no effective curative measure removed that prejudice. RRS objected that counsel's $100 million story was not evidence, but the objection was overruled on the ground that counsel was presenting argument. Trial Tr. Vol. 4 at 771:24–772:10. The jury therefore had no reason to disregard it, despite the Court's insufficient statement that the story was not evidence. Nor did the Court instruct the jury that it could punish RRS only for harm to the Plaintiffs caused by the conduct proved in this action. Doc. 169 at 1-30, particularly 13 (Instruction 12), and Doc. 170 at 1-2. Punitive damages may not be imposed to punish injuries allegedly inflicted on nonparties. *Philip Morris USA v. Williams*, 549 U.S. 346, 353–57 (2007).

Fourth, the verdict confirms a substantial risk of prejudice. The jury awarded each Plaintiff $150,000 in actual damages and $500,000 in punitive damages, for a total award of $1.3 million. The punitive awards alone totaled $1 million. Doc. 170 at 1-2; Doc. 171 at 1. Those awards are especially significant because the evidence of willfulness was thin: RRS did not refuse to investigate or fabricate information; its investigator examined the dispute materials and relied on two searches performed after the White email. The asserted defect was RRS's failure to take an additional step to reconcile conflicting information. That evidence may support the Court's negligence determination, but it does not strongly support conscious disregard of an obvious and unjustifiably high statutory risk.

This case therefore differs materially from cases declining to order a new trial after improper argument because the district court immediately intervened, gave a meaningful curative instruction, and the verdict rested on overwhelming evidence. Here, the objection to the most inflammatory extra record argument was overruled, the erroneous accuracy instruction reinforced Plaintiffs' theory, and the proof of the mental state necessary for punitive damages was contested and limited.

The interaction of these errors matters. The jury was instructed on a nonactionable duty, told that RRS violated that duty for 1,230 days, informed that another court had considered RRS's conduct potentially reckless, and urged to impose punishment by reference to nationwide consumers and an unrelated $100 million verdict. Their cumulative prejudicial effect requires a new trial on damages, willfulness, and punitive damages. Doc. 169 at 6; Trial Tr. Vol. 4, 696:7-24, 697:2-13, 727:4-13, 771:24–772:23.

**C. Remittitur**

If the Court declines to enter judgment as a matter of law or grant a new trial on liability, it should conditionally grant a new trial on damages unless Plaintiffs accept substantial remittiturs. The compensatory awards are not reasonably supported by evidence of harm caused by RRS's post-notice conduct, and the punitive awards are excessive under both Rule 59 and constitutional due-process principles.

Rule 59(a) authorizes a new trial on "all or some of the issues" for any reason historically recognized in federal court, including an excessive damages award. Fed. R. Civ. P. 59(a)(1)(A). In the ordinary remittitur case, the Court determines whether substantial trial evidence supports the amount awarded and, if it does not, fixes the maximum amount reasonably supported by the record. *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987). The plaintiff must then be given the choice between accepting the reduced award and proceeding to a new trial on

damages. *O'Gilvie*, 821 F.2d at 1448. The moving party bears the burden of demonstrating that the verdict is "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Bond*, 173 F.4th at 1305 (10th Cir. 2026) (quoting *Hynes v. Energy West, Inc.*, 211 F.3d 1193, 1206 (10th Cir. 2000)). The ultimate question is whether the award is so excessive that it shocks the judicial conscience and creates an irresistible inference that passion, prejudice, or another improper cause affected the verdict. *Id.* at 1305–06. That determination is "a fact-intensive inquiry" focused on whether the evidence actually presented at trial substantially supports the amount awarded. *Id.* at 1307.

Punitive damages require a separate analysis. A court first may determine under Rule 59 whether the award is excessive as a matter of federal common law. *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1060–61 (10th Cir. 2016). It must separately determine, under an exacting de novo review, whether the award exceeds constitutional limits. *Id.* Constitutional review considers: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.*, 1061-76. Unlike an ordinary common-law remittitur, a court may reduce punitive damages directly to the constitutional maximum. *Id.*, 818 F.3d at 1062.

**1. The $150,000 Compensatory Award to Each Plaintiff Exceeds the Maximum Amount Supported by the Evidence.**

The jury awarded each Plaintiff exactly $150,000 in actual damages. Doc. 170. Those identical awards cannot be reconciled with the materially different evidence concerning each Plaintiff, the different dates on which RRS's statutory duties arose, and the extensive evidence of independent causes of their alleged injuries.

#### a. The Awards Improperly Encompass Injuries Predating RRS's Alleged Violations

RRS's duties under § 1681s-2(b) did not arise when it first credit reported the account. They arose only after RRS received notice of a dispute from a consumer reporting agency. The earliest potentially actionable response concerning Albuerne occurred on November 20, 2023; Jenkins's earliest potentially actionable response occurred on January 13, 2024. Trial Tr. Vol. 2 at 239:10-19, 382–84; Trial Tr. Vol. 3 at 575–80. Plaintiffs nevertheless asked the jury to compensate them for the entire collection dispute beginning April 1, 2023. Counsel repeatedly invoked "1,230 days" of alleged harm and calculated damages using periods that substantially preceded either Plaintiff's actionable dispute. Trial Tr. Vol. 4 at 696, 726–27, 771–72. The verdict form did not require the jury to identify the compensable period or allocate damages among emotional distress, credit denials, or other asserted injuries. Doc. 170. The resulting undifferentiated awards therefore provide no assurance that the jury excluded the many months of pre-violation harm that Plaintiffs affirmatively asked it to compensate.

A furnisher is not liable under § 1681s-2(b) for distress caused by the existence of the underlying debt, the initial furnishing of the account, or events predating receipt of an ACDV. The awards must be confined to injuries caused by RRS's allegedly deficient investigations. Because the requested time-based calculation invited recovery for nonactionable periods, and because the verdict provides no means of separating those amounts, a new trial on damages is warranted unless Plaintiffs accept a reduction to the maximum supported by the post-notice evidence.

##### i. Albuerne's Evidence Does Not Support a $150,000 Award Attributable to RRS.

Albuerne testified to depression, alcohol abuse, marital difficulties, weight gain, difficulty concentrating, and suicidal thoughts. But the evidence did not establish that RRS's post-November 20, 2023 conduct caused those conditions to the extent reflected in the award.

Albuerne acknowledged that he had struggled with bipolar or manic depression for much of his life, had attempted suicide as a teenager, and had been prescribed medication for anxiety before the operative events. Trial Tr. Vol. 2 at 371, 399–405, 430–34. He also admitted that his depression, increased drinking, financial difficulties, and marital problems began months before RRS received the first ACDV. *Id.* at 371, 430–34, 449–55. The couple's living conditions, their extended periods apart, employment pressures, high revolving-credit utilization, other debts, and longstanding marital disagreements supplied substantial independent explanations for the distress described at trial. *Id.* at 395–405, 430–34, 449–57.

The asserted mortgage denial does not support the award. The denial letter was admitted only for its effect on Albuerne—not as proof of the lender's reasons—and no Navy Federal witness testified. *Id.* at 385–93. The letter identified other considerations, including high revolving balances or utilization, and Albuerne conceded that he was not an underwriter, lacked underwriting training, did not know the applicable criteria, and did not contact Navy Federal to determine the reason for the decision. *Id.* at 389–93, 413–15, 449–57. He later obtained mortgage financing after multiple variables had changed, including his income, employment history, marital status, and lender. Trial Tr. Vol. 3 at 466–68.

**ii. Jenkins's Evidence Was Still More Attenuated.**

Jenkins's first potentially actionable investigation was not completed until January 13, 2024. Yet much of the distress she described - including drinking, arguments, dissatisfaction with the couple's housing, financial pressure, work-related travel, and serious marital problems—occurred during spring and summer 2023. Trial Tr. Vol. 3 at 516–29, 575–80. She testified that the marriage was already nearly over by April 2024 and acknowledged several substantial non-RRS causes of the couple's difficulties. *Id.* at 529, 552–64.

Jenkins also presented no competent evidence that RRS caused a credit denial. The Capital One document did not identify the reason for the decision, she did not retain or review an adverse-action letter, and she did not know the lender's underwriting criteria. *Id.* at 552–56, 580–82. She had other derogatory accounts, including two Chase defaults, medical collections, and another rental collection, and admitted that RRS did not cause all of her credit problems. *Id.* at 561–64, Trial Tr. Vol. 3 at 581:25–582:20.

The record therefore does not support awarding Jenkins the same amount as Albuerne, who claimed a mortgage denial, substantial physical and psychological manifestations, and suicidal thoughts. The identical awards, notwithstanding the materially different proof, reinforce that the amounts were not individualized findings of injury caused by RRS.

RRS does not contend that the absence of medical evidence precludes all emotional-distress damages. It contends that the evidence, confined to the legally compensable periods and discounted for established independent causes, cannot support $150,000 for each Plaintiff. The maximum amounts reasonably supported are no more than $75,000 for Albuerne and $50,000 for Jenkins. At minimum, the Court should remit each award substantially below $150,000 or order a new trial limited to actual damages.

**2. The $500,000 Punitive Award to Each Plaintiff Is Excessive.**

If the Court grants RRS's Rule 50 motion on willfulness, both punitive awards must be vacated. Even if some evidence permits a willfulness finding, however, $500,000 per Plaintiff is excessive under both the common law and the Due Process Clause.

**a. The Punitive Damages Award Should Be Reduced Under Common Law Remittitur Principles.**

If the Court declines to enter judgment as a matter of law on willfulness, RRS independently challenges the amount of each punitive award under Rule 59 and traditional

common-law remittitur principles. This challenge is separate from RRS's constitutional objection. The distinction matters because the two inquiries apply different standards and authorize different remedies. See *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1060–62 (10th Cir. 2016).

Even assuming sufficient evidence supports willfulness (which RRS disagrees), the evidence does not justify $500,000 in punitive damages for each Plaintiff. Appawu testified that she reviewed the ACDVs, their supporting documents, and RRS's account history, including White's email and Montane's subsequent unsuccessful searches for the payment. Trial Tr. Vol. 3 at 591–603. The asserted deficiency was RRS's failure to reconcile conflicting information through further investigation. The distinction between that conduct and deliberately fabricating information or knowingly reporting a nonexistent debt remains relevant to the amount of punishment, even if the jury permissibly found the investigation reckless.

Plaintiffs' closing supplied the jury with no evidence-based method for calculating punitive damages. Counsel proposed ratios of six- or nine-times compensatory damages, requested an award in the millions, asserted without supporting financial evidence that violating the FCRA was more profitable than complying with it, and invoked an unrelated punitive verdict reportedly approaching $100 million. Trial Tr. Vol. 4 at 729, 768–73. Counsel also asked the jury to send a message affecting RRS's conference-room decisions and its treatment of consumers other than Plaintiffs. *Id.* at 771–73.

Those arguments encouraged punishment for hypothetical nonparty harm and supplied inflammatory numerical anchors untethered to the evidence. See *Philip Morris*, 549 U.S. at 353–357. The jury's $1 million aggregate punitive award—more than three times the already substantial compensatory awards—reflects the danger that those improper considerations influenced its calculation.

RRS therefore requests an express finding that each $500,000 punitive award exceeds the maximum reasonably supported by the evidence. Given the nature of the investigative failures, the absence of demonstrated intentional injury, and the substantial compensatory recovery, RRS submits that the supported punitive amount should not exceed $150,000 per Plaintiff if the actual-damages awards remain intact. If actual damages are reduced to the amounts requested above, RRS requests corresponding punitive reductions to $75,000 for Albuerne and $50,000 for Jenkins. These requested amounts rest on the evidence and the purposes of punishment and deterrence; RRS does not suggest that common law mechanically requires punitive and compensatory damages to be equal. The Court should condition denial of a new trial on Plaintiffs' acceptance of the remittitur.

**b. Independently, the Punitive Damages Award Exceeds Constitutional Limits.**

The Court must separately determine whether each punitive award satisfies due process. Constitutional review requires an independent, exacting assessment of the award; deference appropriate to ordinary remittitur does not resolve that inquiry. *Lompe*, 818 F.3d at 1061–62. The controlling guideposts are reprehensibility, proportionality to actual or potential harm, and comparable civil penalties. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003). *Lompe* is instructive. Although the Tenth Circuit upheld the property manager's liability for punitive damages, it reduced the award from $22.5 million to $1.95 million, a 1:1 ratio to its compensatory liability. The case involved carbon-monoxide poisoning, prior dangerous incidents, and risks of serious physical injury. Nevertheless, the substantial compensatory recovery and the degree of reprehensibility did not justify the larger punishment. *Lompe*, 818 F.3d at 1063–69, 1075–76.

#### i. The Evidence Establishes a Low Degree of Reprehensibility.

When a plaintiff receives compensatory damages, punitive damages should only be awarded when the defendant's conduct is so "reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Lompe*, 818 F. 3d at 1065, citing *State Farm*, 538 U.S. at 419. Reprehensibility is the most important constitutional guidepost. *Lompe,* 818 F. 3d. at 1066, citing*, BMW of. N. Am. v. Gore,* 517 U.S. 559, 575 (1996). Courts consider whether the harm was physical or economic; whether the conduct threatened health or safety; whether the plaintiff was financially vulnerable; whether the conduct was repeated or isolated; and whether it involved intentional malice, trickery, or deceit rather than accident. *Id.*

The first factor is whether the harm was physical or economic. Plaintiffs described emotional distress and purported economic issues. Plaintiffs did not seek any medical services regarding any of their emotional distress damages. In *Lompe*, the jury found both physical and economic damage but the actual damages compensated plaintiff for those injuries. *Lompe,* 818 F. 3d at 1065–66.

Factors two, four and five favor RRS. These factors relate to RRS's actions. Although the Court held that RRS could have taken an additional step, that does not show that RRS acted with indifference or reckless disregard of the Plaintiffs' health and safety. RRS did not fabricate information, refuse to investigate, or conceal a known error. Appawu reviewed the ACDVs, attachments, account history, White's email, and the results of Montane's two later searches. She relied on Montane's more recent confirmations that the payment could not be located. The asserted defect was her failure to take an additional step to reconcile conflicting information—not an intentional decision to report information known to be false. This does not reflect that RRS's actions were the result of intentional malice, trickery or mere accident. The failure to take the

additional investigative step is similar to the "failure to act" in *Lompe. Id.* at 1067 ("But AMC's wrongful conduct consisted of a failure to act rather than any intent to injury through affirmative conduct, and thus was not 'the result of intentional malice, trickery, or deceit.'") Lastly, this did not involve repeated wrongful conduct. RRS only received one ACDV for Albuerne and two for Jenkins.

The third factor also favors RRS. Although Plaintiffs had financial difficulties, but that does not, however, establish that RRS deliberately exploited a known vulnerability or pursued a broader course of comparable misconduct. RRS didn't refuse to investigate because of Plaintiff's financial situation. Instead, they investigated and relied on the more recent information from its client regarding the payment.

For these reasons, there is a little to none reprehensibly supporting the excessive punitive award.

**ii. The Ratio is Excessive Given the Nature of the Compensatory Awards.**

The punitive awards are 3.33 times each Plaintiff's $150,000 compensatory award. That ratio cannot be considered in isolation. When compensatory damages are substantial, a punitive award equal to compensatory damages may reach the constitutional limit. *Lompe*, 818 F. 3d at 1069, citing *State Farm*, 538 U.S. at 425. Applying that principle, the Tenth Circuit reduced a $2 million punitive award to a 1:1 ratio with $630,307 in compensatory damages. *Jones v. United Parcel Service, Inc.*, 674 F.3d 1187, 1207–08 (10th Cir. 2012). It likewise reduced an 11.5:1 punitive award to 1:1 where substantial compensatory damages included emotional distress. *Lompe*, 818 F.3d at 1064–69, 1073-76.

The present ratio becomes even more extreme once the compensatory awards are reduced to amounts supported by the evidence. A $500,000 punitive award would represent approximately

6.67 times a $75,000 award to Albuerne and ten times a $50,000 award to Jenkins. Such ratios cannot be justified by the low degree of reprehensibility established here.

The FCRA decision in *Cortez* further illustrates the disproportionality. There, Trans Union's procedures falsely associated the plaintiff with terrorists and narcotics traffickers, and the evidence supported a substantially greater degree of reprehensibility. Nevertheless, the district court reduced punitive damages from $750,000 to $100,000—twice the $50,000 compensatory award—and the Third Circuit affirmed. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 705–06, 723–24 (3d Cir. 2010). The conduct here does not justify punitive damages five times the remitted punitive award in *Cortez*. Given the substantial compensatory awards and the comparatively low reprehensibility of RRS's conduct, a 1:1 ratio is the maximum constitutionally sustainable ratio.

**iii. No Comparable Sanction or Financial Evidence Supports the Awards.**

The third *Gore* guidepost provides no affirmative support for $500,000 awards. Courts have recognized that the FCRA does not prescribe a truly comparable civil penalty for an individual punitive-damages award. *Cortez*, 617 F.3d at 724. Section 1681n permits statutory damages of $100 to $1,000 as an alternative to actual damages for a willful violation, while separately permitting punitive damages in an amount allowed by the court. 15 U.S.C. § 1681n(a). Although that provision is not a punitive cap, its statutory scale afforded RRS no fair notice that the investigative deficiency alleged here could result in a $500,000 punitive award to each plaintiff.

**3. The Appropriate Relief**

RRS respectfully requests that the Court:

- condition denial of a new trial on actual damages upon Albuerne's acceptance of a reduction from $150,000 to no more than $75,000 and Jenkins's acceptance of a reduction from $150,000 to no more than $50,000;

- vacate the punitive awards entirely if the Court grants judgment as a matter of law on willfulness;
- alternatively, reduce each punitive award to no more than the corresponding remitted compensatory award—a maximum of $75,000 for Albuerne and $50,000 for Jenkins;
- if the Court declines to remit the compensatory awards, reduce each $500,000 punitive award to no more than $150,000, producing a 1:1 ratio; and
- order a new trial limited to damages if Plaintiffs decline the common-law remittitur.

Any greater award would exceed the maximum amount reasonably supported by this record and would impose punitive damages disproportionate to the conduct the jury was permitted to consider.

### D. The Partial Summary Judgment Ruling Should Be Vacated Because It Removed Disputed Questions of Inaccuracy and Reasonableness from the Jury.

The partial summary judgment ruling rests on related errors of law and fact that warrant relief under Rule 59. First, the Court treated the inaccuracy element as undisputed even though RRS expressly disputed that Plaintiffs had paid the balance and that its reporting was inaccurate. Second, the Court resolved the reasonableness of RRS's investigation as a matter of law even though the record permitted competing reasonable inferences. The Tenth Circuit's intervening, published decision in *Ward v. National Credit Systems, Inc.*, issued after the interlocutory liability ruling, confirms the materiality of both errors.

#### 1. The Court Did Not Decide the Threshold Inaccuracy Element That *Ward* Requires The Court to Consider.

The February 25, 2026 Order correctly identified inaccuracy or incompleteness as an element of a claim under § 1681s-2(b) but then stated that "The parties do not dispute that Rent Recovery is a furnisher of information, nor do they dispute that the information Rent Recovery

furnished was inaccurate or incomplete." Doc. 103 at 10. On that premise, the Court confined its analysis to the reasonableness of RRS's investigations. *Id.* at 10–16. The summary judgment briefing shows otherwise. RRS expressly disputed Plaintiffs' assertion that they had paid the balance in full, disputed Plaintiffs' assertion that the reporting was "patently false," and supported those denials with evidence that Montane twice reported that it could not locate the cashier's check or confirm that the payment had been posted. Doc. 95 at 2-5. RRS thus did not concede either actual payment or inaccuracy. Plaintiffs themselves recognized the dispute, devoting briefing to whether payment of the debt was "objectively and readily verifiable." Doc. 97 at 31-32. The Order's statement that inaccuracy was undisputed therefore overlooked a contested, dispositive element.

That error is material under the Tenth Circuit's subsequent decision in *Ward.* It holds that a plaintiff asserting an unreasonable-investigation claim under § 1681s-2(b) must make a prima facie showing that the furnished information was, in fact, inaccurate or incomplete. *Ward*, 182 F.4th at 930. The court emphasized the required order of proof: if there is no actionable inaccuracy, "the reasonableness of the investigation is not in play." *Id.* (quoting *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022)). And when the furnisher challenges the sufficiency of that element, the court must first determine whether the asserted inaccuracy was "objectively and readily verifiable" as containing a mistake or error. *Id.* at 933.

The February Order did not conduct that threshold analysis. Indeed, the Order cited the district court decision in *Ward* when identifying the elements of Plaintiffs' claim, Doc. 103 at 10 n.27, but the Tenth Circuit subsequently reversed the judgment arising from that proceeding because the plaintiff had not established an objectively and readily verifiable inaccuracy. *Ward*,

182 F. 4th at 934–936. The intervening appellate decision therefore directly affects the analytical foundation of the liability ruling here.

The competing evidence precluded treating actual inaccuracy as established without analysis. Plaintiffs relied on White's September 2022 email, a bank-account screenshot, and the subsequently obtained cashier's-check evidence. Doc. 86, Ex. 3, at 2-4 (White email); Doc. 86 Ex. 2 at 2 (bank screenshot); Doc 86 Ex. 25 at 2-3 (custodian certification and cashier's check image). RRS relied on Montane's later reports that it had searched for its physical checks and electronic records, could not locate the payment, and did not show the payment as posted. Doc. 103 at 4-8. The screenshot established a withdrawal in the relevant amount but did not, standing alone, establish who negotiated the instrument or whether Montane credited it to Plaintiffs' account. White's email supported receipt, while Montane's later searches and account records supported the contrary inference that the payment had not been located or credited.

Plaintiffs' subsequently obtained cashier's check evidence may bear materially on whether they ultimately can prove actual inaccuracy. But the Order did not analyze that evidence under the summary judgment standard, identify what it conclusively established, or explain why no reasonable jury could credit RRS's contrary evidence. Instead, it bypassed the element altogether based on the mistaken premise that RRS had conceded it. Doc. 86-25 at 2-3; Doc. 103 at 10, 12-16. *Ward* does not permit liability to rest on that assumption. To determine if Montane received, negotiated, or properly credited the check requires credibility determinations, quasi-discovery, and/or complex fact-gathering unavailable through an FCRA dispute investigation process. As the Tenth Circuit held such a dispute is not objectively readily verifiable, therefore it is not actionable under the FCRA. *Ward*, 182 F. 4th at 933. At minimum, however, the conflicting evidence required adjudication of the inaccuracy element rather than treating it as conceded.

**2. The Reasonableness of RRS's Investigation Was Not "beyond question."**

Even if Plaintiffs could establish an actionable inaccuracy under *Ward*, the reasonableness of RRS's investigation should have been submitted to the jury. Reasonableness ordinarily presents a factual question, and summary judgment is proper only when the reasonableness or unreasonableness of the investigation is "beyond question." *Maiteki v. Marten Transportation Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016). The Court's own recitation of the record demonstrates competing permissible inferences. Appawu did not merely compare identifying data or ignore the ACDVs. She reviewed the ACDVs, their dispute codes, the attached images, the parties' account history, and RRS's account notes. Doc. 103 at 7-8. She understood that Plaintiffs claimed to have paid the balance by cashier's check; reviewed White's email stating that Montane had received the check; compared that email with Montane's two later searches and confirmations that the check could not be found and had not been posted; and concluded that the later information supported verification of the account. *Id.* at 4-8.

Those facts distinguish this case from one in which a furnisher disregards a dispute or mechanically verifies an account without considering new information. Trial Tr. Vol. 3, 591–603; Doc. 103 at 7-8, 12-16. Appawu considered the White email. The disputed question was whether, after considering that email together with Montane's two later responses, a reasonably prudent investigator was required to contact Montane yet again or take some other additional step. RRS's failure to take that additional step could support a finding of unreasonableness, but it does not make that conclusion the only one a reasonable jury could reach.

*Maiteki* is instructive. It holds that an investigation need not be exhaustive and that, when circumstances warrant, a furnisher may rely on its records and on confirmation from a person with knowledge. *Maiteki*, 828 F.3d at 1275–77. Here, RRS's file contained more than just Montane's

assertion that a debt was owed. It contained Montane's February 2023 explanation that it had searched its physical checks and electronic system without locating the payment, as well as Montane's July 2023 response to RRS's renewed inquiry that it still did not see the payment. Doc. 103 at 4-8. A jury could reasonably find that Appawu was entitled to give those later confirmations greater weight than White's earlier receipt email, particularly where the dispute materials did not include a check trace identifying who negotiated the instrument.

The Court instead weighed the competing records and determined that a prudent investigator necessarily would have undertaken one more inquiry. Doc. 103 at 12-16. That is precisely the factual determination *Maiteki* ordinarily reserves for the jury. The existence of an additional investigative step does not itself establish that every investigation omitting that step was unreasonable as a matter of law. Viewing the evidence and reasonable inferences in RRS's favor, a jury could find either that reliance on Montane's later confirmations was reasonable or that another inquiry was required. Because more than one conclusion was permissible, the investigation's unreasonableness was not "beyond question."

The Court should therefore amend the judgment, vacate the portion of the February 25, 2026 Order granting Plaintiffs partial summary judgment, and deny Plaintiffs' motion. If the Court concludes under *Ward* that the asserted inaccuracy was not objectively and readily verifiable, it should enter judgment for RRS. Otherwise, it should order a new trial at which Plaintiffs must prove actual, actionable inaccuracy and an unreasonable investigation, along with the remaining elements of their § 1681s-2(b) claims.

## CONCLUSION

For the reasons stated above, RRS respectfully requests that its Motion be granted.

DATED this 11th day of September 2026.

Respectfully submitted,

SPENCER FANE LLP

By: s/ Joshua C. Dickinson
Joshua C. Dickinson KS Bar No. 20632
1000 Walnut, Suite 1400
Kansas City, MO 64106
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
E-mail: jdickinson@spencerfane.com

and

John H. Bedard, Jr., *admitted pro hac vice*
Jonathan K. Aust, *admitted pro hac vice*
Bedard Law Group, P.C.
4855 River Green Parkway, Suite 310
Duluth, GA 30096
Telephone: (678) 253-1871
jbedard@bedardlawgroup.com
jaust@bedardlawgroup.com

ATTORNEYS FOR DEFENDANT RENT RECOVERY SOLUTIONS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the United States District Court for the District of Kansas this 11th day of September 2026 with notice of case activity generated and sent to counsel of record.

s/ Joshua C. Dickinson